# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**<u>Gregory Maggi</u>**

      v.

Case No. 17-cv-253-PB
Opinion No. 2024 DNH 029

**<u>Warden, New Hampshire
State Prison</u>**

## <u>MEMORANDUM AND ORDER</u>

Gregory Maggi was convicted in New Hampshire state court for sexually assaulting and distributing drugs to young girls. He filed a petition for a writ of habeas corpus in this court pursuant to 28 U.S.C. § 2254, raising various constitutional challenges to his conviction and sentence. The New Hampshire State Prison Warden now moves for summary judgment on each of Maggi's claims. I grant the warden's motion for summary judgment in part and deny it in part, without prejudice to the warden's ability to raise her arguments in a renewed motion.

# I.   __BACKGROUND__[1]

## A.   Underlying Facts

Beginning in 2009, Maggi obtained space in a facility in Ashland known as "the Factory." Jury Trial Tr. at 176, 1113.[2] Maggi's rented space contained an office, various cars, a "house bus," a "party bus," a work trailer, and two large trampolines. Id. at 134, 1110, 1113.

On October 31, 2010, eleven-year-old H.C. was spending time with a friend behind the Factory when she was approached by Maggi. Id. at 329. Maggi, who was then twenty-nine years-old, invited the girls inside to jump on his trampoline. Id. at 329, 1107. Maggi and H.C. developed a friendship, and H.C. eventually introduced Maggi to one of her friends, twelve-year-old D.B. Id. at 208, 210, 330-31. Beginning in the summer of 2011, H.C. and D.B.

---

[1]    The following facts are drawn from the record before, and the decisions of, the state courts involved in Maggi's trial, post-conviction litigation, and appeals. See Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

[2]    For clarity and convenience, citations to "Doc. No. ___" refer to docket entries in the current case, Maggi v. Warden, No. 17-cv-253 (D.N.H. filed June 22, 2017); citations to "Motion Hr'g Tr." refer to sequentially paginated transcripts of a motion hearing held on March 26 and 27, 2014 in Maggi's trial court case, State v. Maggi, No. 215-2013-cr-55 (N.H. Sup. Ct. Dec. 22, 2014); citations to "Jury Trial Tr." refer to sequentially paginated transcripts from Maggi's trial, which was held August 25 through September 5, 2014, in State v. Maggi, No. 215-2013-cr-55 (N.H. Sup. Ct. Dec. 22, 2014); and citations to "Habeas Hr'g Tr." refer to sequentially paginated transcripts from the hearing on Maggi's petition for habeas corpus in Maggi v. Warden, No. 217-2017-cv-325 (N.H. Sup. Ct., Nov. 8, 2019).

went to the Factory several times a week to jump on Maggi's trampolines. <u>Id.</u> at 208, 213-14, 330-31. On at least one occasion that summer, Maggi served alcohol to the young girls. <u>Id.</u> at 212-13, 331-33, 341. Maggi also provided D.B. with a "white substance" that D.B. would snort through a straw and that Maggi said was cocaine. <u>Id.</u> at 227-28.

In the fall of 2011, D.B. introduced Maggi to several of her other friends, including M.D., J.M., and S.M, all of whom were between twelve and fifteen years old. <u>Id.</u> at 353, 356, 537, 539, 720, 722. Maggi gave J.M. and S.M his business card and told them that they could use his trampolines anytime. <u>Id.</u> at 357-58, 539-40. The group of girls would visit Maggi at the Factory frequently, where he would provide them with alcohol, marijuana, cocaine, and crack cocaine. <u>Id.</u> at 368, 445, 491, 543-45, 564, 643-44, 649.

On one occasion, M.D. spent the night with Maggi in his "house bus." <u>Id.</u> at 234-36, 248. On another occasion, Maggi kissed J.M. and S.M. and told them that he wished he could "do stuff" with them, but that he would "get in a lot of trouble" because they were not "old enough." <u>Id.</u> at 619-20. Maggi showed J.M. and S.M. sex toys and pornography and, upon learning that J.M. and S.M. were in a romantic relationship, encouraged the two girls to engage in sexual acts with each another while he watched. <u>Id.</u> at 445, 553, 557, 563-64, 647-49.

A few months later, in November 2011, Maggi started having sex with S.M. and J.M. Id. at 460, 487. Maggi had sex with the girls individually and together on multiple occasions and provided them with sex toys. Id. at 380-81, 389-90, 487-91, 532-33, 554-59, 564-66, 634, 637. This continued until approximately December 2011, when S.M. ended her relationship with J.M. and stopped seeing Maggi. Id. at 561-62, 636-37. Maggi continued to have sex with J.M. until she was grounded in January 2012 and could not leave to visit Maggi for a month. Id. at 370, 423.

Once J.M. was no longer grounded, she visited Maggi to obtain marijuana. Id. at 428-29, 441, 518. Before giving J.M. the drugs, Maggi put his hands in J.M.'s pants and touched her vagina, even though she told him no. Id. at 435-41, 518-21, 1092.

A few months later, in June 2012, D.B. and M.D. introduced their friend, J.D., to Maggi. Id. at 662, 667, 679. J.D., who was twelve years old at the time, went to the Factory on a few occasions. Id. at 660. On one occasion, Maggi forcibly pulled J.D. onto his lap. Id. at 671-73, 733-35, 759. On another occasion, Maggi served alcohol to J.D. and D.B. Id. at 662-63.

**B.   Investigation**

A few months later, in the fall of 2012, J.D.'s father discovered inappropriate Facebook messages between Maggi and his daughter. Id. at 698, 702. He alerted the other parents and provided the Facebook messages

to the police. Id. at 89-90, 315, 446, 528. The police spoke with J.M. and S.M,
who told the police that Maggi had sexually assaulted them and provided
them with drugs. Id. at 89, 307, 321, 569, 791. The girls provided the police
with various items that Maggi had given them, including sex toys, Maggi's
business card, and a pair of his sweatpants. Id. at 791-92, 922-23.

The victims were later interviewed at the Child Advocacy Center (CAC)
in a recorded interview. In addition to speaking about the accusations against
Maggi, S.M. told the CAC investigator that, a few years ago, her uncle "raped
[her]" and made her sister "give him head." Doc. 40-4 at 13-15. S.M. stated
that she thought her father "told . . . DCYF" and that DCYF "kind of asked
[her] about it." Id. at 14. The CAC investigator stated that she was going to
look into the matter, although it is unclear what, if any, followup occurred.
Id.

In January 2013, the police spoke with Maggi in a recorded interview.
Maggi stated that he believed the police wanted to speak with him about
"various nefarious activities with children," and admitted to spending time
with the group of young girls at the Factory. Jury Trial Tr. at 807-08. Maggi
admitted that J.M. and S.M spent the night with him in his bed but denied
having sexual contact with them or any other under-aged girls. Id. at 808-11.

Shortly after the interview, the police obtained a warrant and executed
a search of the Factory. Id. at 803-04, 855-57, 870, 966. The police recovered

Maggi's computers and hard drives, as well as various sex toys and pornographic videos. Id.

In February 2013, a grand jury indicted Maggi on 13 felony charges, including three charges of aggravated felonious sexual assault, seven charges of felonious sexual assault, two charges of endangering the welfare of a child, and three charges of distribution of a controlled substance. Id. at 28-35. Maggi was also charged with several misdemeanor offenses, including five charges of simple assault and one charge of exposing minor to harmful material. Id.

**C.     Criminal Proceedings**

    1.   <u>Pre-Trial Proceedings</u>

Maggi initially retained Attorney Mark Sisti to represent him in the criminal proceedings. Doc. 28 at 55. After obtaining several continuances, Sisti withdrew from the case and Attorney Simon Mayo of the New Hampshire Public Defender's Office was appointed as counsel. Id. at 55-56. Shortly thereafter, Maggi filed a motion for self-representation. Id. at 56. The court held a hearing and granted Maggi's motion after a lengthy colloquy advising Maggi of his rights. Id. Attorney Adam Hescock of the New Hampshire Public Defender's Office was appointed as standby counsel. Id. Attorney Michael Anderson also filed a limited appearance on Maggi's behalf to assist Maggi with certain motions. Id. at 58.

One of the motions filed by Maggi sought to question some of the victims about aspects of their sexual past. Doc. 40-3 at 12; see State v. Howard, 121 N.H. 53, 60-61 (1981) (noting that a defendant may admit evidence of a witness's "specific prior sexual activity" only "[u]pon a showing of particular relevance") (quoting State v. Johns, 615 P.2d 1260, 1263-64 (Utah 1980)). At the hearing on his motion, Maggi told the court that he wished to question S.M. about the allegations she made to CAC against her uncle, claiming that it was relevant to her "knowledge to fabricate." Motion Hr'g Tr. at 54.

The prosecutor, Assistant County Attorney (ACA) Melissa Pierce, told the court that she had spoken with S.M. about the allegations during the prior week. Id. at 55-56. ACA Pierce stated that S.M. "indicated" that her uncle "touched her" on "her chest area" then "put her hand down into her lap." Id. at 56. S.M. denied, however, that "anything occur[ed] with [her] uncle that was similar to what happened with Mr. Maggi" and stated that the incident was never reported to the police. Id. ACA Pierce, not wanting to traumatize S.M. further, did not ask for further details. Id.

Although Maggi did not have a transcript of S.M.'s CAC interview at the hearing, he represented to the court that he believed S.M. had previously "mention[ed] fellatio and sex" as well as "something about DCYF." Id. at 58. Maggi asserted that S.M. was now "saying completely different story," and

that he should be permitted to question her on the matter. Id. Following the hearing, the court issued a brief order denying Maggi's Howard motion, noting that it was both untimely and insufficiently specific to meet Maggi's burden of demonstrating that the allegations were relevant and more probative than prejudicial. Doc. 40-3 at 3-4.

2.    Trial Proceedings

Shortly after the motion hearing, Maggi retained Attorney Peter Decato to take over his representation. Doc. 28 at 58. After a few more continuances, the case proceeded to a jury trial.

At the trial, the State presented testimony from each of the victims, as well as several other children who had spent time with Maggi at the Factory. J.M. testified about having sex with Maggi approximately "every other day," both individually and with S.M. Jury Trial Tr. at 379-80. She also testified that she witnessed Maggi have sex with S.M. and use "sex toys" on her. Id. at 381.

S.M. provided a similar account to the jury, stating that she had sex with Maggi and engaged in "threesomes" with J.M. and Maggi on multiple occasions. Id. at 557-59, 637. S.M. testified specifically about one occasion when her friend, T.T., walked in on her and Maggi engaging in oral sex. Id. at 563-64. T.T. corroborated this account, testifying that she saw S.M. and Maggi in "very close, intimate contact." Id. at 1089.

On two separate occasions during the trial, Decato renewed Maggi's request to question S.M. about the allegations against her uncle. On the first occasion, Decato represented to the judge that, according to Maggi, S.M. "reported that she was raped" then "later said it didn't happen." Id. at 655. Both the court and ACA Lara Saffo, the new prosecutor on the case, questioned the accuracy of Maggi's representations. Id. Because Decato did not have with him a transcript of the CAC interview or ACA Pierce's statements to provide to the court as an "offer of proof," the court declined to revisit its prior ruling. Id. at 655-56.

Decato renewed his request again later in the trial, this time providing the court with a transcript of S.M.'s CAC interview. Id. at 944. Decato asserted that ACA Pierce had previously told the court that S.M. "recanted" those allegations and argued that he should be able to use the recantation to impeach S.M. Id. at 946. ACA Saffo again questioned whether it was true that ACA Pierce told the court that S.M. recanted her allegations but stated that, in any event, the court would have taken that into consideration in issuing its initial ruling. Id. The judge rejected Decato's request, noting that Maggi had the relevant information "for a long, long time" and didn't present "anything new" to warrant re-opening the matter mid-trial. Id. at 949.

The State proceeded to present a number of other witnesses, including D.B., who testified to her interactions with Maggi. Over Maggi's objection,

the State entered into evidence Facebook messages between Maggi and D.B. that contained sexual references and innuendo. Doc. 40-4 at 20. In one of the messages, Maggi invited D.B. to come by the Factory, noting that he could "think of a few fun things [they] can do" and that they could "find some toys or something to play with." Jury Trial Tr. at 243-44. In another message, Maggi told D.B. that he "love[s] sex" and that "[s]ex is way too much fun." Id. at 247. D.B. then asked Maggi if he "d[id] anything" with M.D. the night that M.D. slept over at the Factory. Id. at 248. Maggi responded "[n]othing all that fun" and denied having kissed M.D., which Maggi stated "would have fallen under the category of fun." Id. Maggi told D.B. that he had "hop[ed] [D.B.] would stay" that night, noting that he didn't think M.D. "finds [him] all that attractive." Id.

The State also showed the jury the video of Maggi's interview with the police. Id. at 868. The video was partially redacted by order of the court based on the court's conclusion that some statements in the interview were inadmissible. Doc. 40-4 at 11. For example, the court redacted references in the interview to the victims' consensual sexual activities with third parties and Maggi's refusal to take a polygraph test. Id. at 11-12. The jury nonetheless saw substantial portions of Maggi's interview, including portions where he admitted to communicating with the witnesses over Facebook and

spending significant time with the young girls at the Factory. Jury Trial Tr. at 1237-38, 1256, 1264.

At the close of the State's case, Decato successfully moved to dismiss two of the charges against Maggi for insufficient evidence. Id. at 1021, 1024. In presenting Maggi's defense as to the remaining charges, Decato focused his efforts on undermining the victims' credibility. Decato cross-examined J.M. and S.M. at length and was able to highlight various inconsistencies in their testimony and establish that they made some untruthful statements to investigators. See, e.g., id. at 459-60, 617. Decato also called a number of witnesses to testify about when Maggi removed the trampolines from the Factory and the dates that the victims first disclosed the sexual assaults, in an attempt to undermine the children's timeline of events. See, e.g., id. at 1037, 1040.

Finally, Maggi took the stand in his own defense. Maggi denied the allegations that he had had sexual relations with any of the victims or that he provided them with drugs. He admitted to regularly exchanging Facebook messages with D.B. but asserted that he did not send the sexually explicit messages shown to the jury. Id. at 1137. Maggi attempted to assert that his Facebook had been hacked, but he was prevented from doing so after the State objected. Id. at 1137-38.

Maggi then addressed the video of his interview and asserted that it did not reflect his "complete interview." Id. at 1188. Maggi noted that the video omitted his multiple requests to speak with a lawyer and that "there [were] other things in the interview that went completely missing." Id. Maggi then testified about how the "pixel size" in the video was suspicious and that he believed someone "opened [the video] up in an editing software, remove[d] the parts they didn't want anyone to see, and then re-film[ed] it so that you couldn't see it in the metadata." Id. Maggi concluded by stating that "[t]here were parts [of the video] that were redacted by the Court, and there were parts that were illegally removed," at which point the State objected. Id. at 1188-89.

At sidebar, the prosecutor argued that Maggi's testimony inappropriately conveyed to the jury that the State was "redacting stuff inappropriately." Id. at 1189. The court agreed that, because Maggi was not qualified to testify about technical aspects of the video, he was "engaging in conjecture and speculation," and his testimony was "completely inadmissible." Id. at 1189-90. The court agreed to give a curative instruction, without objection. Id. at 1192.

The following day, the court informed the jury that the video had, in fact, been redacted pursuant to a court order and that the jury was "not to

12

consider Mr. Maggi's testimony on that subject at all" or "speculate as to what" was redacted from the video. <u>Id.</u> at 1235.

The defense rested at the close of Maggi's testimony and delivered closing arguments. Decato's arguments principally focused on calling into question the children's testimony, telling the jury that the case came down to who they "f[ound] most believable." <u>Id.</u> at 1316.

Following two days of deliberation, the jury found Maggi guilty of seven counts of felonious sexual assault, three counts of distribution of a controlled drug, and two counts of simple assault. <u>Id.</u> at 1379-88. Maggi was sentenced to five 3.5 to 7 year prison sentences to run consecutively, for a total sentence of 17.5 to 35 years in prison.

　　　3.　　<u>Appellate Proceedings</u>

Following Maggi's conviction, Decato filed a notice of mandatory appeal with the New Hampshire Supreme Court raising four claims of error. Doc. 1-1 at 3. Decato eventually withdrew from the case, and Attorney David Rothstein entered an appearance on Maggi's behalf. Doc. 28 at 62.

Rothstein submitted a brief to the New Hampshire Supreme Court that did not address the issues raised in Decato's notice, but rather briefed three distinct issues. Specifically, Rothstein asserted that the trial court erred by (1) prohibiting Maggi from cross-examining S.M. about her recanted sexual assault allegations, (2) allowing the state to introduce Maggi's Facebook

messages with D.B. into evidence, and (3) instructing the jury to disregard Maggi's testimony that the video had been impermissibly edited. Doc. 40-1 at 5. Maggi sought leave to file a pro se supplemental brief raising nine additional issues, but his request was denied. Doc. 28 at 31-34.

The New Hampshire Supreme Court entered an order rejecting Maggi's claimed errors and affirming his conviction. Doc. 1-3. In considering Maggi's claim that he should have been permitted to ask S.M. about her recantation, the court first noted that "the record is not clear that S.M. recanted a prior sexual assault allegation" because ACA Pierce never clarified what S.M. meant when she stated that what happened with her uncle was not "similar to" what happened with Maggi. Id. at 1. The court nonetheless declined to resolve the matter, instead concluding that any error in excluding cross-examination was harmless beyond a reasonable doubt. Id. The court reasoned that, in light of the overwhelming evidence of Maggi's guilt—including, most notably, the victims' corroborated testimony and eyewitness accounts of abuse—the "impeachment value of cross-examining S.M. concerning her recantation. . . would not have affected the verdict." Id. at 2.

The court also concluded that the trial judge acted within his discretion in admitting the Facebook conversations with D.B., noting that the messages were relevant to Maggi's "sexual intent" towards the victims and not unduly prejudicial. Id. at 4. Finally, the court affirmed the trial judge's instruction to

disregard Maggi's testimony about the taped interview. Id. at 5. The court

noted that, viewed in context, the instruction did not require the jury to

disregard any testimony from Maggi that was "based on his recollection [of

the interview], the video recording" was impermissibly edited. Id. (emphasis

in original). Rather, the instruction only required the jury to "disregard his

testimony about the court-ordered redactions." Id. Accordingly, the court

concluded that, contrary to Maggi's arguments on appeal, he had been

permitted to testify "about his recollection of the interview." Id. (emphasis

in original).

Rothstein filed a motion asking the court to reconsider its order, which

the court denied. Doc. 1-4 at 1.

## D.   State Habeas Proceedings

Attorney Sven Wiberg filed a habeas corpus petition on Maggi's behalf

in New Hampshire Superior Court (state habeas court) pursuant to N.H. Rev.

Stat. Ann § 534:1. See Petition for Writ of Habeas Corpus, Maggi v. Warden,

No. 217-2017-cv-00325 (N.H. Sup. Ct., Nov. 8, 2019) (hereinafter "State

Petition").[3] The petition principally asserted that Maggi received

constitutionally ineffective assistance of counsel from Decato, Rothstein, and

---

[3]      Maggi's state habeas petition was not submitted in the record but is
nonetheless subject to judicial notice. See Fed. R. Evid. 201; Stan Lee Media,
Inc. v. Walt Disney Co., 774 F.3d 1292, 1298 n.2 (10th Cir. 2014).

his various pre-trial attorneys. Id. at 2-6. In addition, Maggi argued that the state trial court had "effectively" denied Maggi his right to represent himself. Id. at 6.

The state habeas court held an evidentiary hearing on Maggi's petition over the course of seven days. Doc. 28 at 54. Maggi testified on his own behalf for four of those days. Towards the end of Maggi's testimony, the proceedings were stayed for a period of time so that Wiberg could obtain additional information about Maggi's mental health. Habeas Hr'g Tr. at 515-17, 520.

When the proceedings resumed, Wiberg withdrew from the case and Maggi began representing himself with some assistance from his sister, Attorney Katherine Maggi. Id. at 534-35. Maggi called Decato and Rothstein to the stand, who testified at length about their litigation strategies and interactions with Maggi. Id. at 653, 783. Maggi then called a family member who was present for his trial to discuss her observations of counsel's interactions with Maggi. Id. at 538.

The court subsequently issued a thirty-three-page decision denying Maggi's habeas claims. Doc. 28 at 54-86. The court summarily denied Maggi's claims regarding the assistance of his pre-trial counsel, noting that there was no "legal or factual support" for Maggi's assertions and that Maggi "presented no evidence that any of his pre-trial counsel were deficient or that they prejudiced the outcome of his trial." Id. at 64. Turning to Maggi's claims

against Decato, the court found that Decato was not constitutionally ineffective at trial. The court reasoned that Decato's decisions were reasonable strategic choices and, in any event, did not prejudice Maggi since the actions Maggi faulted Decato for failing to take were largely baseless or legally flawed. Id. at 67-69. The court further found that, contrary to Maggi's assertion, Decato had not impermissibly truncated Maggi's trial in order to prioritize a different trial. Id. at 81-82. The court similarly rejected Maggi's claims against Rothstein, pointing to evidence from the hearing that Rothstein consulted with Maggi regularly and made reasonable strategic decisions about which claims to prioritize on appeal. Id. at 83-84. Finally, the court concluded that Maggi was not denied the right to represent himself. To the contrary, the court found that Maggi was "afforded the right and opportunity to represent himself" and "exercised that right until he decided to proceed with counsel." Id. at 84-85.

Maggi filed a notice of appeal with the New Hampshire Supreme Court challenging the state habeas court's order and asserting various other errors arising out of his criminal trial. Id. at 96-101. The New Hampshire Supreme Court declined Maggi's appeal. Id. at 103.

## E.   Federal Habeas Proceedings

Maggi filed his habeas corpus petition in this court shortly after he filed his state court petition. He then successfully moved to stay proceedings

in this court until the conclusion of the state habeas proceedings. Doc. 3. While the stay was in place, Wiberg withdrew as counsel and Maggi entered a notice of pro se appearance. Doc. 13; Doc. 9.

Once the stay was lifted, Maggi filed an amended petition in this court, which the court construed as raising over eighty distinct claims. Doc. 31 at 4-17. Maggi's claims fall into three broad categories. First, Maggi raises several claims challenging rulings made by the trial court throughout his criminal proceedings as violative of his Fifth Amendment, Sixth Amendment, and Fourteenth Amendment rights. Second, Maggi raises claims of ineffective assistance of counsel against his pre-trial attorneys, Decato, and Rothstein. Finally, Maggi asserts that the State's prosecutors engaged in various forms of misconduct. The Warden has moved for summary judgment on all of Maggi's claims. Doc. 49.

## II.  **STANDARD OF REVIEW**

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016). In this context, a "material fact" is one that has the "potential to affect the outcome of the suit." Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). A "genuine dispute" exists if a factfinder could resolve the

disputed fact in the nonmovant's favor. Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018).

The movant bears the initial burden of presenting evidence that "it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); accord Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018). Once the movant has properly presented such evidence, the burden shifts to the nonmovant to designate "specific facts showing that there is a genuine issue for trial," Celotex, 477 U.S. at 324, and to "demonstrate that a trier of fact could reasonably resolve that issue in [his] favor." Irobe, 890 F.3d at 377 (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)). If the nonmovant fails to adduce such evidence on which a reasonable factfinder could base a favorable verdict, the motion must be granted. Celotex, 477 U.S. at 324. In considering the evidence, the court must draw all reasonable inferences in the nonmoving party's favor. Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).

## III.   ANALYSIS

Section 2254 enables a federal court to grant habeas corpus relief "only on the ground that [a person] is in custody in violation of the Constitution or

laws or treaties of the United States."[4] 28 U.S.C. § 2254(a). Maggi asserts that his conviction is tainted by various constitutional violations arising out of the trial court's rulings, the constitutionally deficient performance of his attorneys, and the misconduct of the State's prosecutors.

Some of Maggi's claims were previously adjudicated by the New Hampshire Supreme Court, whereas others were adjudicated by the state habeas court during Maggi's state habeas proceedings. I begin by analyzing the claims that have already been expressly considered by the state courts before proceeding to Maggi's remaining claims.

## A.    Claims Adjudicated in State Court

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), if a state court has adjudicated a petitioner's claims on the merits, habeas relief is warranted only if the adjudication (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," id. § 2254(d)(1), or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). The

---

[4]    Several of Maggi's claims are based on alleged errors that pertain to charges that did not result in a conviction or a custodial sentence. Because Maggi is not "in custody" on those charges, his challenges to those charges must be dismissed. Claims A(2); B(4)(f)(ii); B(4)(g); B(4)(h); B(4)(i)(ii); B(4)(j); B(4)(k).

petitioner bears the burden of proving that the state court's adjudication was unreasonable under this "highly deferential standard." Cullen, 563 U.S. at 181 (quoting Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam)).

A state court adjudication is contrary to clearly established federal law if the court "applies a rule that contradicts the governing law set forth by the Supreme Court or confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from its precedent." Chum v. Coyne-Fague, 948 F.3d 438, 443 (1st Cir. 2020) (cleaned up). A state court's decision unreasonably applies clearly established federal law if the state court "identifies the correct governing legal principle from the Supreme Court's then-current decisions but unreasonably applies that principle to the facts of the prisoner's case." Abrante v. St. Amand, 595 F.3d 11, 15 (1st Cir. 2010) (quoting Aspen v. Bissonnette, 480 F.3d 571, 574 (1st Cir. 2007)). To be unreasonable, a state court's application of existing federal law must be "more than incorrect or erroneous." Rosenthal v. O'Brien, 713 F.3d 676, 683 (1st Cir. 2013) (quoting Yeboah-Sefah v. Ficco, 556 F.3d 53, 65 (1st Cir. 2009)). Rather, the state court's application of existing legal principles must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Virginia v. LeBlanc, 582 U.S. 91, 94 (2017) (per curiam)

21

(quoting Harrington v. Richter, 562 U.S. 86, 103 (2011)).

In determining whether a state court decision is based on an unreasonable determination of the facts, federal courts must defer to state court fact finding when "[r]easonable minds reviewing the record might disagree about the finding in question." Quintanilla v. Marchilli, 86 F.4th 1, 17 (1st Cir. 2023) (quoting Brumfield v. Cain, 576 U.S. 305, 314 (2015)).[5]

1.   Trial Court Rulings

Maggi asserts that the trial court made two evidentiary rulings that violated his Sixth and Fourteenth Amendment rights: First, he challenges the court's decision to prevent him from cross-examining S.M. about what he claims is her recanted allegation that she had been sexually assaulted by her uncle; and second, he challenges the court's instruction to the jury to disregard testimony Maggi attempted to give about redactions to a taped statement he gave to the police. Both alleged errors were considered and ultimately rejected by the New Hampshire Supreme Court on Maggi's direct appeal from his conviction.[6] Because Maggi appears to have challenged the

---

[5]   Section 2254(e)(1) provides that a state court's factual determination "shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by 'clear and convincing evidence.'" Because it remains an open question in this court how subsections (d)(2) and (e)(1) "fit together," Quintanilla, 86 F.4th at 17, I base my analysis of Maggi's' claims only on the standard set forth in subsection (d)(2).

22

trial court's rulings in state court only under state evidentiary law, the New Hampshire Supreme Court did not expressly consider whether the trial court's rulings violated Maggi's federal constitutional rights. Nonetheless, as I will explain, the New Hampshire Supreme Court's reasonable findings of fact and conclusions of law are entitled to deference and effectively dispose of both claims. See Foxworth v. St. Amand, 570 F.3d 414, 426 (1st Cir. 2009).

The New Hampshire Supreme Court rejected Maggi's challenge to the trial court's ruling on S.M.'s recantation testimony by concluding that, even if the ruling was in error, the error was nonetheless "harmless beyond a reasonable doubt." Doc. 1-3 at 1. Although framed as a conclusion of state law, the New Hampshire Supreme Court's decision is nonetheless "entitled to deference under section 2254(d)(1) as long as the state and federal issues are for all practical purposes synonymous and the state standard is at least as protective of the defendant's rights." Scott v. Gelb, 810 F.3d 94, 99 (1st Cir.

---

[6]     The New Hampshire Supreme Court also ruled on Maggi's claim that the trial court erred by admitting Maggi's Facebook conversations with D.B. into evidence. Doc. 1-3 at 3-4. The court's ruling was based purely on state evidentiary law and bears no connection to Maggi's constitutional claim. For the reasons I explain in Part B of this order, I cannot determine on the present record whether Maggi properly exhausted his claims that the admission of this evidence was a constitutional error. Accordingly, the warden's motion for summary judgment as to those claims is denied without prejudice. Claims A(3)(d)-(e).

2016) (cleaned up); see also Strickland v. Goguen, 3 F.4th 45, 54 n.14 (1st Cir. 2021).

Here, the court applied a state law harmless-error standard that is the functional equivalent of the federal harmless-error standard established in Chapman v. California, 386 U.S. 18, 24 (1967). See id. ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."). In Mitchell v. Esparza, 540 U.S. 12, 18 (2003) (per curiam), the Supreme Court held that where, as here, "a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless the harmlessness determination itself was unreasonable." Fry v. Pliler, 551 U.S. 112, 119 (2007) (emphasis in original) (summarizing Esparza). Therefore, the determinative question is whether the New Hampshire Supreme Court's conclusion that any error was harmless beyond a reasonable doubt "was an unreasonable application of Chapman." Connolly v. Roden, 752 F.3d 505, 511 (1st Cir. 2014); cf. id. at 506, 511 (concluding that, where a state supreme court found an error to be "harmless under a standard equivalent to the federal standard under Chapman," the state's decision was entitled to deference so long as the decision was not "an unreasonable application of Chapman").

24

Maggi has not cited to any Supreme Court case law that is contrary to the New Hampshire Supreme Court's harmlessness ruling, which was a plainly reasonable decision under federal law. The New Hampshire Supreme Court appropriately considered the facts presented at trial and the "strength of the parties' cases" in determining that the error was harmless beyond a reasonable doubt. See id. at 513. In doing so, it supportably found that, given the corroborating testimony from J.M and T.T. that they witnessed Maggi's abuse of S.M., the impeachment evidence would not have altered the jury's verdict. Cf. United States v. Connolly, 504 F.3d 206, 217 & n.6 (1st Cir. 2007) ("[T]he force of impeachment evidence is diminished when the witness's testimony is supported by substantial corroborating evidence[.]"). Accordingly, Maggi is not entitled to habeas relief on this claimed error.[7]

---

[7]     My conclusion would be the same even if I were to analyze Maggi's claims de novo under the "actual prejudice" standard established in Brecht v. Abrahamson, 507 U.S. 619, 637 (1993). Under Brecht, a petitioner is not entitled to habeas relief unless he can establish that the trial court's error "had substantial and injurious effect or influence in determining the jury's verdict." Id. at 623 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). Specifically, Maggi is not entitled to relief for this alleged violation of his constitutional rights because he cannot establish that the trial court's decision to exclude evidence of S.M.'s alleged recantation resulted in actual prejudice considering the overwhelming evidence against him, including, most notably, (1) the eyewitness accounts of the alleged assaults, (2) the substantial consistency between J.M. and S.M.'s testimony on the graphic details of the assaults, (3) the sex toys and pornography recovered from the Factory, which were consistent with J.M. and S.M.'s testimony, and (4) Maggi's own statements, where he corroborated significant portions of S.M.'s

Maggi next asserts that the trial court violated his constitutional rights when it instructed the jury to disregard his testimony that the video of his police interview had been illegally altered. The New Hampshire Supreme Court rejected Maggi's characterization of the jury instruction and noted that, viewing the instruction in context, the jury was only prohibited from considering Maggi's testimony about the court-ordered redactions.[8] Doc. 1-3

_____

testimony. Maggi's claims therefore fail under either standard. See Connolly, 752 F.3d at 511.

[8]    The full instruction given to the jury was as follows:

> Yesterday, during the Defendant's testimony, Defendant, Mr. Maggi, testified that the Court had redacted portions of his videotape interview at the police department with the state police, which you have seen. Mr. Maggi is correct.

> Certain minor portions of his interview were redacted by court order after a hearing in which both parties had input. The court determined as a matter of law that certain extraneous parts of the interview were inadmissible evidence. That was a ruling made after both parties had input. You are not to consider Mr. Maggi's testimony on that subject at all. It is stricken from the record.

> And you are not—I am instructing you not to speculate as to what that evidence was or was not. It's not before you. It is extraneous information that is not evidence, has not been presented as evidence in this courtroom. And you are not to—it was a decision by the Court, a ruling by the Court as a matter of law and you are not to give it any prejudice or weight in favor or against either party as a result of that ruling.

Jury Trial Tr. at 1235-36.

at 4-5. As the New Hampshire Supreme Court recognized, the prosecutor's objection was focused on Maggi's assertion that "the Court redacted something." Jury Trial Tr. at 1191. Accordingly, the trial court's instruction spoke only of the court-ordered redactions and required the jury to disregard "Maggi's testimony <u>on that subject</u>," without addressing the other portions of Maggi's testimony. <u>Id.</u> 1235 (emphasis added). Therefore, the court concluded that the instruction left Maggi's testimony that the video was incomplete intact.

Maggi has not presented a persuasive argument to support his contention that the Supreme Court's resolution of his issue was based on an unreasonable application of the facts. Instead, the record support the reasonableness of the court's determination that the trial court's limiting instruction was carefully crafted to prevent the jury from concluding that the court had improperly ordered redactions to Maggi's police statement without limiting Maggi's ability to testify as to his own recollection of his interview.

For these reasons, Maggi's claims challenging the New Hampshire Supreme Court's rulings must be dismissed.[9]

---

[9]     Claims A(3)(c); A(6)(a).

2.   Ineffective Assistance of Counsel

Maggi claims that he received ineffective assistance of counsel in violation of the Sixth Amendment. See Strickland v. Washington, 466 U.S. 668, 685-86 (1984) (recognizing the right of a criminal defendant to the "assistance of counsel"). "To establish that a lawyer's performance fell below the constitutional norm, a [petitioner] must make a two-part showing." Miller v. United States, 77 F.4th 1, 5-6 (1st Cir. 2023). First, the petitioner must demonstrate that his counsel's performance "was objectively unreasonable under prevailing professional norms." United States v. Mercedes-De La Cruz, 787 F.3d 61, 67 (1st Cir. 2015). In making this determination, courts must apply "a strong presumption—albeit a rebuttable one—that counsel's choices among available courses of action fall within the wide range of reasonable professional assistance that, under the circumstances, might be considered sound strategy." Miller, 77 F.4th at 6 (cleaned up). It is only where "counsel's choice was so patently unreasonable that no competent attorney would have made it" that counsel's performance will be deemed deficient. Flores-Rivera v. United States, 16 F.4th 963, 969 (1st Cir. 2021) (quoting Rossetti v. United States, 773 F.3d 322, 327 (1st Cir. 2014)).

Second, the petitioner must demonstrate that "he was prejudiced by counsel's deficient representation." Rivera-Rivera v. United States, 844 F.3d 367, 372 (1st Cir. 2016). "To establish prejudice, the defendant must show

that, but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different." Sleeper v. Spencer, 510 F.3d 32, 39 (1st Cir. 2007).

Because most of Maggi's ineffective assistance of counsel claims were considered by the state habeas court, Maggi is only entitled habeas relief if he can demonstrate that the court's conclusions were legally or factually unreasonable.[10]

### a.   Trial Counsel

Maggi argued in his state habeas corpus petition that Decato was constitutionally ineffective for multiple reasons. Among other things, he argued that Decato failed to notice certain affirmative defenses, failed to file certain motions, failed to object to evidence introduced at his trial, failed to call witnesses, failed to obtain a continuance, and failed to effectively cross-examine witnesses. The state habeas court granted Maggi a lengthy evidentiary hearing on these issues and rejected Maggi's arguments in a

---

[10]   Maggi sought to appeal the state habeas court's decision to the New Hampshire Supreme Court, but his appeal was summarily rejected. In such a case, there is a rebuttable presumption that "the unexplained decision adopted the same reasoning" as a lower court's reasoned opinion. Wilson v. Sellers, 584 U.S. 122, 125 (2018); see also Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). Accordingly, I "look through" the New Hampshire Supreme Court's unexplained decision and instead consider the reasonableness of the state habeas court's decision as "the last related state-court decision that [provided] a relevant rationale." Wilson, 584 U.S. at 125.

detailed, carefully reasoned written decision. Doc. 28 at 65-82. The state

habeas court's conclusions on these issues are well supported by both the

trial record and the testimony taken at the evidentiary hearing. Moreover,

the court reasonably applied the <u>Strickland</u> test, which federal courts have

recognized cannot be satisfied by the failure to take actions that "had no

chance of success." <u>United States v. Carter</u>, 355 F.3d 920, 924 (6th Cir. 2004).

Accordingly, I grant respondent's motion for summary judgment with respect

to these claims.[11]

Maggi next asserts that Decato failed to effectively respond to a mid-

trial disclosure by the prosecutor that certain witnesses had changed their

accounts of some of the charged conduct. Although Maggi claims that Decato

should have moved to exclude the testimony or sought a mistrial, the state

habeas court concluded that Decato's decision to instead use the changed

details to impeach the witnesses was a reasonable one. The court explained

that Decato made effective use of this impeachment material to undermine

the witnesses' credibility which, after all, was the principal strategy at trial.

Doc. 28 at 71-72.

Notably, Maggi agrees that Decato "did an able job of demonstrating

reasonable doubt" using the changed testimony and only faults him because

---

[11]     Claims B(2); B(4)(i)(i),(iii)-(iv); B(4)(l)-(p); B(4)(s); B(4)(t); B(9); B(11);
B(14)-(18).

that strategy was not ultimately successful. Doc. 61 at 48. Of course, that a trial strategy was ultimately unsuccessful does not mean that it was unreasonable. Strickland, 466 U.S. at 689-90, 699. Because the court reasonably applied federal law in rejecting Maggi's claims, those claims are dismissed.[12] Middleton v. Roper, 455 F.3d 838, 848-49 (8th Cir. 2006) (noting that courts must "give great deference to counsel's informed strategic decisions" and refrain from "second-guess[ing] a lawyer's trial strategy") (quoting Laws v. Armontrout, 863 F.2d 1377, 1393 (8th Cir. 1988)).

Maggi further argues that Decato was ineffective for failing to obtain and present surveillance footage from the security cameras at the Factory. Relying on testimony from the criminal trial, the court concluded that the Factory's surveillance tapes were programmed to "self-eras[e]" after a few days and therefore would not have contained any "relevant data" when they were "collected months after the assaults." Doc. 28 at 78. Maggi does not cite to any evidence sufficient to call into question the court's conclusion.

In light of this supported factual determination, the court reasonably concluded that Decato was not constitutionally deficient for failing to obtain or present the security footage. After all, counsel cannot be ineffective for failing to enter into evidence that which does not exist. Lewis v. Horn, 581

---

[12]    Claims B(7)(a)-(c); B(8).

F.3d 92, 114 (3d Cir. 2009). Maggi's claims as to this issue are therefore dismissed.[13]

Finally, Maggi argues that Decato impermissibly truncated his presentation of Maggi's defense in order to prioritize a different trial. The state habeas court found that, although it was true that Decato had another trial set to begin shortly after Maggi's, there was no evidence that he prematurely truncated Maggi's trial to attend to his other trial. Doc. 28 at 81-82. The court noted that, to the contrary, there was evidence in the record that Decato prioritized Maggi's trial over his upcoming trial. Maggi cites only to evidence that Decato spoke frequently of his upcoming trial but fails to demonstrate by clear and convincing evidence that the court's findings were unreasonable. Deferring to the court's reasonable findings of fact, Maggi's claims on this issue necessarily fail.[14]

### b.   Appellate Counsel

Maggi similarly challenges Rothstein's performance on appeal, arguing that he failed to appropriately investigate Maggi's case or consult with Maggi and trial counsel. Maggi further asserts that Rothstein's failure to raise certain issues in his appellate brief was constitutionally deficient.

---

[13]   Claims B(1); B(10).
[14]   Claims A(7); B(12); B(13).

The state habeas court considered and rejected each of these claims. The court concluded that, because Maggi did not specify what investigation Rothstein should have undertaken or how that would have changed the outcome of his appeal, he did not meet his burden of demonstrating that Rothstein was ineffective. Id. at 83. Turning to Maggi's next claimed error, the court cited to testimony from the hearing that Rothstein did, in fact, frequently confer with Maggi and trial counsel and that, in any event, Maggi did not demonstrate that any alleged failure to communicate resulted in prejudice. Id. at 83-84. Finally, the court concluded that Rothstein reasonably applied his substantial experience in choosing which issues to brief to the New Hampshire Supreme Court. Id. at 84.

Maggi has failed to articulate what investigation or communication Rothstein should have undertaken, let alone demonstrate that the court's ruling on this matter was unreasonable. Although Maggi identifies certain issues that he believes Rothstein should have briefed, he has not demonstrated that Rothstein's contrary choices were patently unreasonable. See Jones v. Barnes, 463 U.S. 745, 750-52 (1983) (noting that attorneys are not required to "raise every nonfrivolous issue requested by the client" on appeal and emphasizing the "importance of winnowing out weaker arguments on appeal" in order to focus on "a few key issues"). Accordingly, I

defer to the state habeas court's reasonable application of federal law and dismiss Maggi's claims challenging Rothstein's performance.[15]

3.    Right to Self-Representation

Finally, Maggi asserts that the trial court violated his Sixth Amendment right to represent himself. Doc. 61 at 19-20; see Faretta v. California, 422 U.S. 806, 807 (1975) (recognizing the right of a criminal defendant to "proceed without counsel when he voluntarily and intelligently elects to do so"). Maggi asserts that he was not afforded the same opportunities as counsel to advocate on his behalf and that the trial court's refusal to provide him with the tools necessary to engage in self-representation, such as appropriate access to a law library or computer, amounted to a constitutional violation. Doc. 61 at 19-20.

The state habeas court considered and rejected these claims, finding that the record showed that "Maggi was afforded the right and opportunity to represent himself" and that he "exercised that right until he decided to proceed with counsel." Doc. 28 at 85. The court concluded that Maggi "was afforded the full rights of any counsel to file motions and be heard at hearings on those motions," noting that Maggi filed and argued multiple pro se motions, some of which were ultimately granted. Id. at 84-85. Maggi

---

[15]    Claims C(1)-(4).

benefitted from the assistance of appointed stand-by counsel throughout the course of his self-representation. Id. at 85. And, when Maggi ultimately elected to obtain counsel, it was due to his "his family's request," rather than any undue influence by the court or the State. Id.

Maggi has not presented any evidence to call into question the habeas court's factual conclusions that he was permitted to represent himself and afforded all the same opportunities as counsel. Nor has he cited to any Supreme Court precedent that is contrary to the habeas court's implicit rejection of his asserted right to various legal materials. See State Petition at 6 (asserting that the trial court violated Maggi's constitutional rights "by not providing him the ability to research and litigate"). To the contrary, the Supreme Court has stated that there is no "clearly establis[hed]" right of a pro se defendant to access a law library or any other "specific legal aid" and that, therefore, habeas relief on such claims is inappropriate. Kane v. Garcia Espitia, 546 U.S. 9, 10 (2005) (per curiam); see 28 U.S.C. § 2254(d)(1). Accordingly, Maggi's claim that he was denied the right to represent himself must be dismissed.[16]

---

[16]     Claim A(4).

**B.    Remaining Claims**

The parties' briefing fails to make clear whether Maggi's remaining constitutional claims were ever presented to or decided by either the New Hampshire Supreme Court or the state habeas court. A federal court ordinarily cannot grant a writ of habeas corpus unless the petitioner has exhausted the remedies available in the state court. 28 U.S.C. § 2254(b)(1); Taylor v. Medeiros, 983 F.3d 566, 576 (1st Cir. 2020). To properly exhaust a claim, a petitioner must "'present the federal claim fairly and recognizably' to the state courts." Clements v. Maloney, 485 F.3d, 158, 162 (1st Cir. 2007) (quoting Casella v. Clemons, 207 F.3d 18, 20 (1st Cir. 2000)).

The warden addresses the exhaustion requirement in passing but fails to meaningfully engage with the record or adequately explain why Maggi's claims should be deemed waived. Maggi, in turn, does not substantially engage with the warden's assertion that his claims were waived and fails to cite to evidence in the record that he appropriately exhausted his claims.

For example, Maggi challenges several of the trial court's rulings but fails to demonstrate that he raised these errors to the state courts as constitutional violations.[17] Maggi similarly raises a number of claims of prosecutorial misconduct but does not identify when those claims were raised

---

17      Claims A(1); A(3)(a)-(b); A(3)(f)-(h); A(5); A(6)(b); A(8)-(16).

in the state court or how they were resolved.[18] Finally, Maggi claims that he received constitutionally ineffective assistance from his various pre-trial attorneys.[19] Although the state habeas court summarily rejected the claim that Maggi's pre-trial attorneys were constitutionally ineffective, it is not clear from the present record whether the habeas court was addressing the same claims raised here or separate claims against the pre-trial attorneys. Doc. 28 at 64.

Without adequate briefing that addresses whether Maggi's remaining claims were exhausted in the state courts or how those courts resolved his claims, I cannot determine whether Maggi's claims are properly before this court. See Mercado-Alicea v. P.R. Tourism Co., 396 F.3d 46, 51 (1st Cir. 2005) ("District courts are not required to ferret through sloppy records in search of evidence supporting a party's case."). Accordingly, the warden's motion for summary judgment as to Maggi's remaining claims is denied, without prejudice to the warden's ability to raise her arguments in a renewed motion that adequately addresses the question of exhaustion.

## IV.   CONCLUSION

For the foregoing reasons, the warden's motion for summary judgment (Doc. 49) is granted in part and denied in part, without prejudice to the

---

18      Claims D(1)-(4).
19      Claims B(3); B(4)(a)-(e); B(4)(f)(i),(iii); B(4)(q)-(r); B(5)-(6).

warden's ability to raise her arguments in a renewed motion for summary judgment.[20] The clerk of court is directed to schedule a status conference to discuss a briefing schedule for the remaining claims. No further filings will be permitted until after the conclusion of the status conference.

As to the claims substantively addressed in this order, Maggi has failed to make a substantial showing of the denial of any constitutional right, and no jurists of reason would find it debatable whether this court's assessment of the constitutional claims or procedural rulings are correct. Therefore, I decline to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(2); Rule 11, Rules Governing Habeas Corpus Cases Under Section 2254; First Cir. LR 22.0; see also Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).


SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

March 31, 2024

cc:   Gregory Maggi, pro se
      Counsel of record

---

[20]   The warden's motion is granted as to the following claims: A(2); A(3)(c); A(4); A(6)(a); A(7); B(1)-(2); B(4)(f)(ii); B(4)(g)-(p); B(4)(s)-(t); B(7)-(18); C(1)-(4). It is denied without prejudice as to the remaining claims: A(1); A(3)(a)-(b); A(3)(d)-(h); A(5); A(6)(b); A(8)-(16); B(3); B(4)(a)-(e); B(4)(f)(i),(iii); B(4)(q)-(r); B(5)-(6); D(1)-(4).